THOMASSON *et al. v.* HUDMON.

No. 12199. February 19, 1938. Rehearing denied March 17, 1938.

*J. T. Thomasson* and *Boykin & Boykin,* for plaintiffs in error.

*J. L. Smith* and *Samuel J. Boykin,* contra.

GRICE, Justice. ■ The plea of res judicata was properly stricken, or, as the record recites, "overruled." It was held in *Walden* v. *Mahnks,* 178 *Ga.* 825 (174 S. E. 538, 95 A. L. R. 1101): "Although letters of administration have been granted upon a supposed intestacy and the administrator has obtained a final discharge, a will thereafter presented to the court of ordinary may nevertheless be admitted to probate, and this without previous annulment of the former judgments." That decision in principle controls the point here made. There the caveators sought to plead the judgment as a bar to the application for probate; but this court, while recognizing that the court of ordinary, within the scope of its jurisdiction, had determined an intestacy, said that such an adjudication, if it could be so designated, is not conclusive to the same extent as other judgments.

■ Counsel for the defendant in error insist that J. T. Thomasson, who had previously been appointed administrator on the theory that Mrs. Thomasson died intestate, was not a proper party to the proceeding asking for probate in solemn form; and for this they cite the Code, § 63-303. If J. T. Thomasson was improperly joined, the defect was one of form, and not of substance. Such defect must be taken advantage of at the first term. *Georgia Railroad & Banking Co.* v. *Tice,* 124 *Ga.* 459 (52 S. E. 916, 4 Ann. Cas. 200). A complaint appearing for the first time as a ground of a motion for new trial, that the court refused to sustain a motion to strike him as a party, comes too late.

■ It is not a ground for new trial that the sheriff, without the knowledge and consent of movants, selected as jurors certain persons one of whom was actually accepted as a trior, the names of the extra jurors not being drawn from the jury-box as required by the act approved March 31, 1937. Such a point can not be successfully raised for the first time after verdict. It must be held that such an irregularity is ground only for a challenge propter defectum, which must be made before verdict; and unless a challenge is so made, the selection of the jury in the manner indicated is not cause for new trial, no matter when it is discovered. Com-

pare *Wright* v. *Davis,* 184 *Ga.* 846, 851 (193 ·S. E. 757). The point was expressly decided by the Court of Appeals in *Lindsey* v. · *State,* 57 *Ga. App.* 158 (194 S. E. 833), in a well-considered opinion by Judge Guerry, holding that "a failure to comply with the provisions of this act makes the juror disqualified propter defectum, and is a good cause for challenge, but is not a good ground for new trial, even though the defendant did not know of the defect until after verdict."

■ The remaining grounds of the motion for new trial have been examined. These complain that the court erred: In refusing to rule out testimony that the copy of the will attached to the petition to probate was a substantial copy of the will signed by Mrs. Thomasson, the witness giving the testimony being a subscribing witness to the will. Also, in permitting a witness to testify that J. T. Thomasson stated that he had a memorandum or inventory of the personal property of the alleged testatrix. Also, in permitting a witness to testify that on the day after the funeral of Mrs. Thomasson, J. J. Thomasson stated to the witness that "she changed her will and left my three daughters out, and I am sorry." Also, in permitting J. J. Thomasson to testify that when he received the paper it had on it a blank space for Mrs. Thomasson to sign; that he mailed Mrs. Barber a list of the personal property; and that in the memorandum, in the handwriting of the alleged testatrix, was an item for Mrs. Nancy Barber. And in admitting other testimony as to the contents of the memorandum; testimony of Mrs. Nancy Barber, as to conversations with Thomasson; testimony of Mrs. Fleming, Mrs. Luck, and Mrs. Meadows, to the effect that Mrs. Thomasson told her she had her will fixed; testimony of J. L. Smith, that the copy of what is alleged as the will that was filed for probate was presented to Mrs. Emma Goodwin, and that she read it; and evidence concerning the alleged copy, after it had been introduced in evidence, tending to show that it was a copy of the instrument signed by Mrs. Thomasson as her will. Also, in excluding from evidence a certified copy of the letters of administration granted by the probate court of Alabama to Trawick as administrator of the alleged testatrix. Also, in failing to charge the jury, without request, the law of circumstantial evidence. And that in a colloquy with counsel over the admission of testimony the judge, in the presence of the jury, used the following language:

"You have here a man who is a party to the cause. He says no such will was made. Now he is attempting to prove that this party to the case made a statement to somebody that a will was executed." None of the errors here complained of are such as to require the grant of a new trial.

■ While the original petition in the court of ordinary was one to prove a copy of a will, court and counsel, when the writing bearing the signature of the subscribing witnesses was produced, treated it as one, not to establish and prove a lost will, but as a proceeding to probate a will in solemn form. Counsel on both sides take this view in their briefs. As a practical question, it makes no difference what nomenclature is given the petition. The writing bearing the attestation clause and the signatures of three attesting witnesses was not lost or destroyed. It was produced. Near the bottom of the fourth page of typewritten matter, at the end of what was evidently intended to be the will of Mrs. Thomasson, are the words and figures: "This the —— day of August, 1935." Nothing else is on the page, written or printed, except a blank, black line apparently made by a typewriter, followed at the end of the blank line by the word " (Seal)." The following page is the one that contains the attestation clause, containing the usual recital: "Signed, sealed, and published by Mrs. Safronia Trawick Thomasson as her last will and testament in the presence of the undersigned as witnesses," etc., to which the signatures of three witnesses are subscribed. The four pages are attached with a single brad. The caveator insists that Mrs. Thomasson never signed the instrument, and no sheet was produced containing her signature. The propounder contends that she did sign it, but that the third sheet at the bottom of which she signed was withdrawn, and another sheet substituted for it, identical with it, except that the substituted sheet contained no signature. In one of the briefs filed by counsel for caveators this statement occurs: "The question is only this: Did Mr. J. J. Thomasson or any one else change this will, and put back the sheet with the names of the three witnesses, as they actually appear?" And this: "The question in this case further is, did Mrs. Thomasson sign this will which was produced, and which they had produced?"

An examination of the brief of the evidence discloses that three witnesses swore that not long before she died Mrs. Thomasson said

to each of them, on different occasions, that her will "was fixed." Mrs. Fleming testified: "Sometime in the summer of 1935, before we went to Tennessee, Mrs. Thomasson asked us to witness her will. We left, I think, about June 1st. I think we got back about September 1, 1935. She never talked to me about it after that. She said her will was fixed." Mrs. Luck's testimony was: "She just said her will was all right. Everything fixed, and Mrs. Goodwin had signed it." Mrs. Meadows swore: "I heard her talking about her will just a few days before she went down in her last illness. She said, 'I have got it fixed.' She was talking about her will." Juanita Dyer testified that she was present on the occasion testified to by the subscribing witness, and: "There was no paper on the center table in the room. Uncle Jimmie put the paper on the table. She wrote on the paper. She wrote long enough, just a short time, about the time it would take her to sign it." One of the subscribing witnesses, J. L. Heaton, did not swear that he actually saw Mrs. Thomasson sign the instrument. He was present on the occasion testified to by the other two subscribing witnesses, and swore that he thought she signed it. In another part of his testimony his language was: "I believe Mr. Thomasson gave her a pen, and she got down to the table as if she was signing it. She just walked up to the table and leaned over as if she was signing it. . . I said to Mrs. Thomasson about witnessing the will, jokingly, I usually get $100 apiece for witnessing wills. Yes, I say that Mrs. Thomasson got down with a pen and looked as if she was signing what was attached just immediately in front of the sheet that I signed." The other two subscribing witnesses testified positively that Mrs. Thomasson signed it. Mrs. Heaton swore that Mrs. Thomasson signed first; that she wrote her name; that she signed the will; that she walked up and signed the will; that she took a fountain-pen and signed it; she wrote her name on the will. "I saw her come up and write. It was on the other sheet. There was a place on the other side, and we did not sign on the same sheet." Mrs. Goodwin, the third subscribing witness, was quite as certain and positive in her testimony. She swore: "She [Mrs. Thomasson] said, 'Let's go in and sign the will,' and we went in and signed it. She went up and signed the will; and Mr. Heaton followed, then Mrs. Heaton, and my signature came last. . . . Mrs. Safronia Thomasson went up to the table. She

went up and wrote on the will. I suppose the paper we signed was the will. That is all the paper I saw. . . Mrs. Thomasson, she walked up and wrote her name on the will. . . She took up the fountain-pen; yes, she signed it." And in answer to the question, "Well, you don't know that she ever wrote her name on the will, do you?" she answered: "Well, I know it, know she did." And she further swore: "I saw her sign it. I saw her sign a paper. Yes, I know of my own knowledge that she did sign this purported will. ·. ;· I said I signed the paper that I claim Mrs. Thomasson signed. I said I signed the only paper that was there."

We have here the testimony of three witnesses that she said her will was "fixed," which the jury could well take to mean "executed." We have three subscribing witnesses, called on to act as witnesses, one of them swearing that he thought she signed it, and the other two swearing positively that she did. Another witness present corroborates them. When the paper, which contains a recital that it is her will, is produced, which these witnesses say they saw Mrs. Thomasson place her signature to, and which bears the genuine signatures of the three subscribing witnesses, it contains every essential of a valid will, except that no signature of the testatrix appears thereon. It is the contention of the propounder that the will of Mrs. Thomasson was after her death recopied, and that the fourth sheet containing the signatures of the subscribing witnesses was removed from the original will which was signed by her and attached to the copy made. In support of this view he relies on the testimony of Mrs. Nancy Barber, as follows: "I had a conversation with Mr. J. J. Thomasson. He told me she had made her will shortly before she died and had written out some lists in her own handwriting that could not be duplicated at all. He said she made her will shortly before she died. He said that he would tell me that I was one of the favorite ones. He told me that the will would not be read until Thursday. He told me, at the breakfast table on Tuesday, he had been looking for it and could not find it. On Wednesday morning I went with Mr. Thomasson to LaGrange. On the way home he made the statement that the will would not be read on Thursday. He said further, when we got down there, he found that he did not have her will, that it was his will that he took. He told me it was stolen after Wednesday, around about Thursday. He said somebody had taken

it. I asked him what anybody wanted with it. He said they just wanted to see if they were remembered in it. I asked him if he was going to make any effort to find out who stole it. He said they would put it back. Whoever stole it would put it back. He did not call any names of anybody. Later in the week he told me he had found it where it was put back. . . At the time Mr. Thomasson told me that some one had stolen it, I asked him where the papers and notes were. He said the box also was stolen. Her safety-deposit box was stolen." And the propounder relies also on the testimony of Mrs. R. F. Hyatt, as follows: "I saw Mr. J. J. Thomasson. I went in to see him the first thing. He said to me, when I had been there just a few minutes, 'Louise, Fronia has changed her will since you were here.' I had left here in August, just about two months before she died. He says, 'She has changed her will, and has left my three daughters out, and I am sorry.'"

We have not attempted to set forth the testimony in its entirety. From it the jury could well have found that Mrs. Thomasson was an intelligent woman, of excellent business qualifications, and knew that a will had to be signed by the maker; that she was very particular as to how it should be drawn, giving J. T. Thomasson instructions as to how it should be drawn, corrected, and sent it back to be redrawn; that she called in her three witnesses to witness the will; that she went up to the table and signed her name on the will; that the sheet was turned back, and the three witnesses signed it; that she told Mrs. Luck that she had her will fixed; that she told Mrs. Fleming, whom she had asked to witness the will, that she already had it fixed, as she went down in her last illness. The jury were from the evidence authorized to believe that J. J. Thomasson, her husband, told Mrs. Hyatt, his niece, that his wife had changed her will since she had visited them in the summer, and had cut out his three daughters, for which he was very sorry; that he told Mrs. Nancy Barber that his wife had made her will a short time before she died and that Mrs. Barber was one of the favorite ones, that the will was lost on Monday night, that it would be read on Thursday; that on Thursday he stated that it was stolen, and that on Friday he stated that it had been put back at the place from which it was stolen, and that it was not signed.

It is true that J. J. Thomasson testified that, though he was present when the three witnesses signed, he knew that Mrs. Thomas-

son never put her signature thereto; but in view of the other testimony, the jury were well within their rights to reject his evidence on that issue.

The paper bearing the signatures of the subscribing witnesses, but without the signature of Mrs. Thomasson, was produced in court, and was before the jury for their inspection. It was by the trial court ordered transmitted to this court for our inspection. We have examined the paper; and although a witness, Creel, introduced by the caveators, testified that in his opinion the brad in the center of the four pages had not been changed, it was for the jury to say, under all the evidence, and upon inspection of the paper itself, where the truth of the issue lies. The jury might have found that the last sheet was loose on the brad, while the first three sheets were tighter. They might have thought it significant that the first three sheets, the one on which the body of the purported will is written, including a blank space for the signature of the testatrix, had a margin on the left about an inch wide, and that on the fourth sheet the margin is only about a fourth of an inch wide. They might likewise have attached significance to the fact that the first three sheets are even at the top where they are bradded with the fourth sheet, whereas the fourth sheet itself, which contains only the attestation clause and the signatures of the subscribing witnesses, is something like an eighth of an inch lower than the first three sheets. Thus the instrument itself might have afforded the jury internal proof that the testamentary part of the instrument had once been detached from the page containing the signatures, and other sheets substituted therefor. On the whole there was ample evidence on which the jury found with the propounder on the only real issue in the case. The verdict having received the approval of the judge, his refusal to grant a new trial will not be disturbed.

*Judgment affirmed. All the Justices concur.*